UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

UNITED STATES OF AMERICA, and
STATE OF FLORIDA ex rel., KATHLEEN M.
SIWICKI,

                    Plaintiffs/Relator,

v.

ARTHUR S. PORTNOW, M.D., AND
ARTHUR S. PORTNOW M.D., P.A. d/b/a
APPLE MEDICAL AND CARDIOLOGY
GROUP,

                    Defendants.
_____/

8:15 cv 987 T 27 MAP

**Filed Under Seal Pursuant to
31 U.S.C. §3730(b)(2)**

COMPLAINT UNDER THE FALSE CLAIMS ACTS
(31 U.S.C. § 3730(b)(2) and Florida Statutes §68.083 et seq)

Comes Now, the UNITED STATES of AMERICA, by and through, Kathleen M. Siwicki,

Plaintiff/Relator, and hereby submits this complaint pursuant to the Federal and Florida False

Claims Acts, 31 U.S.C. §3730(b)(2) and §68.083 Fla. Stat. respectively, and further states as

follows:

**Introduction**

1.      Because of its size, the United States healthcare system is simply too large to

monitor or audit on an individual provider level.  Simply put, the government cannot sit in every

medical office and ensure that the procedure billed was the procedure provided, or that the

diagnosis provided is correct and based on sound medical judgment.  As a result, the Centers for

Medicare and Medicaid Services (CMS), along with insurers and patients, are forced to place great trust in the medical records and documents created by physicians to support their submission of bills.    As evidenced by Defendant's conduct herein, when a physician violates this trust by creating false records in order to bill for more services than necessary or provided, it can go undetected for years and cause the government untold losses in the absence of someone willing to blow the whistle like Relator herein.

2.      Arthur S. Portnow, M.D. (hereinafter "Defendant") and Arthur S. Portnow MD, P.A. d/b/a Apple Medical and Cardiology Group (hereinafter collectively "Defendants"), have orchestrated a significant ongoing fraud on the United States government and the state of Florida, through falsifying medical records and performing unnecessary medical testing on patients for the sole purpose of unlawful gain and personal enrichment.  These schemes should shock no one who has familiarity with the way with which Dr. Portnow has misrepresented himself and his qualifications in the past.

**Parties**

**A. Relator**

3.      Under the federal and state False Claims Acts (FCAs), a person with knowledge of false or fraudulent claims against the government (a "Relator") may bring an action on behalf of the government and herself.  The Relator herein is an original source of information within the meaning of the False Claims Act, 31 U.S.C. §3730(e)(4)(B).

4.      Kathleen M. Siwicki is a resident of Bradenton, Florida.  She is a Certified Cardiovascular Technologist trained to perform highly skilled technical imaging studies such as echocardiograms, abdominal, thyroid, carotid and other vascular ultrasounds.  Ms. Siwicki holds advanced certifications in both cardiac and vascular imaging.  Ms. Siwicki began working for

Defendants in April 2014 and resigned on November 14, 2014, after repeatedly witnessing inappropriate treatment of patients, fraudulent documentation and fraudulent billing.

### B. Defendants

#### i. Arthur S. Portnow, M.D.

5.      Arthur S. Portnow, M.D., is a physician and the sole managing operator and/or registered agent for the medical offices of Arthur S. Portnow MD, P.A. d/b/a Apple Medical and Cardiovascular Group located in Sarasota, Florida .   Dr. Portnow, through his medical practices and offices advertises as specializing in internal medicine, geriatric care, cardiovascular disease, and arrhythmia management.  He has no board certifications and does not currently have any hospital privileges.    Dr. Portnow has a history of misconduct with both the New York Board of Medicine and the Florida Board of Medicine.   Shortly after starting to practice medicine, disciplinary actions taken by the New York Board of Medicine resulted in a two-year license suspension and five-year probation.  Dr. Portnow pleaded guilty to engaging in conduct that evidenced "moral unfitness" and admitted to lying about being board certified in internal medicine and cardiovascular medicine and forging the aforementioned certificates.   Dr. Portnow's disciplinary actions also included limitations in practicing cardioelectrophysiology unless he became board certified.

6.      Dr. Portnow moved to Florida in 1996 to resume his medical practice after being fired by Albany Medical Center in New York.  According to the Findings of Fact from the state of Florida Division of Administrative Hearings, Dr. Portnow attempted to secure employment with Baker & Gilmore, M.D., P.A., a cardiology practice in Jacksonville, Florida when he again represented himself as being board certified in Internal Medicine and Cardiovascular Disease. Baker & Gilmore, sought verification of Dr. Portnow's board and specialty certifications from

the American Board of Internal Medicine (ABIM) at which time it was revealed Dr. Portnow was not certified in either specialty. Furthermore, it was determined that Dr. Portnow had forged his name on certificates that had been issued to another physician. In addition to the certification forgeries, Dr. Portnow fraudulently misrepresented his credentials on insurance forms with the medical practice as well as on his curriculum vitae (CV) by using the notation "F.A.C.C.," indicating he was a Fellow of the American College of Cardiology, while he most certainly was not.

7.      According to the aforementioned Findings of Fact, Dr. Portnow has undergone multiple psychiatric evaluations with recommendations of continued care for which he has not followed. One psychiatrist testified Dr. Portnow "was not a pathological liar but could not identify any other neuropsychopathology." The report further noted since there did not seem to be any underlying psychiatric illness to explain Dr. Portnow's behavior, it appears to be for "personal gratification alone." The report went on to state, in part:

> *"The Respondent's conduct is very disturbing because of its nature.   The Respondent is mature and experienced enough to have known that his deception would be discovered, and still he perpetrated a fraud on professional colleagues jeopardizing their professional reputations and business stability."*

8.      The Florida Board of Medicine placed Dr. Portnow on probation, during which time he was not allowed to practice except under the direct supervision of another physician. He was required to obtain a psychiatric evaluation and fined $3,500. The final order was issued September 5, 2000.

### ii. Arthur S. Portnow M.D., P.A. d/b/a Apple Medical and Cardiology Group

9.      Arthur S. Portnow M.D., P.A. d/b/a Apple Medical and Cardiology Group, is a for profit corporation and fictitious name registered with the Florida Secretary and is the agency through which Dr. Portnow has and continues to submit false claims to the government.

## Jurisdiction And Venue

10.     Jurisdiction is proper in this Court because Relator seeks relief on behalf of the United States of America for violations of 31 U.S.C. §3729.

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331, 1345, and supplemental jurisdiction to entertain common law or equitable claims pursuant to 28 U.S.C. §1367(a).

12.     Relator has made voluntary disclosures to the government prior to the filing of this lawsuit as required by 31 U.S.C. §3730(b)(2)

13.     This Court has personal jurisdiction over Defendant and venue is proper in the Middle District of Florida pursuant to 31 U.S.C. §3732(a) because Defendant maintains its places of business in this District, it transacts business in this District, and because the acts alleged herein to be in violation of 31 U.S.C. §3729 occurred in this District.

## The Nature of the Case

14.     Relator began working for Defendant in April, 2014, as the only full-time ultrasound technologist in the practice.  Relator was one of two technicians employed by Defendant to perform diagnostic cardiac and vascular ultrasounds in his office.  Ultrasound is a non-invasive diagnostic test that has the capacity to diagnose conditions in organs and monitor blood flow in veins and arteries.

15.     Within the first few days of her employment, Relator became aware of the unusual practices occurring in Defendant's office.  Patients were being required to have testing done on different days despite availability and/or the patient's request.  Repetitive studies were being ordered when previous test results were normal.  In addition, certain ultrasound tests were always performed together regardless of patient need.  Relator often spoke to patients who

denied having the ailments that Dr. Portnow documented in their medical records. Relator became increasingly concerned as she had never worked for a cardiologist who treated his patients in this manner or one who performed such a high volume of ultrasound studies.

16.     Relator was required to perform actions that she knew to be inappropriate and wrong based on her training and experience.  For example, Relator was told to assign predetermined billing codes and diagnoses to patient's records before the patient was examined. Relator was forced to perform incomplete ultrasound testing on patients due to the shortened scheduled times for each test in order to accommodate a high volume of patients.  Defendant Dr. Portnow would interpret ultrasound findings as abnormal on studies that she personally performed and knew were normal.

17.     Medicare covers specified ultrasound procedures and will cover additional procedures if they are clinically effective and medically justified.[1]  These services are covered under §1861(s)(3) of the Social Security Act.  The Ethics in Patient Referrals Act (Stark laws) provision allows an exception for physicians and group practices to provide most in-office ancillary services (IOAS), such as ultrasound testing, as long as certain requirements are met  (42 CFR § 411.355(b)).  In the Medicare Payment Advisory Commission's June 2010 report to Congress, they noted the rapid growth of services covered by the IOAS exception and considered evidence that these services are sometimes clinically inappropriate.  Physician self-referral of ancillary services creates an incentive to increase volume under Medicare's current fee-for-service payment that rewards higher volume.

---

[1] Centers for Medicare and Medicaid Services (CMS), "Medicare National Coverage Determinations Manual," Pub. No. 100-03, ch. 1, § 220.5.

**A. Falsified Medical Records**

18.     Dr. Portnow recognized that many patients he saw would not need the otherwise profitable ultrasound tests unless their conditions were misrepresented or other test results were altered.   Therefore, Defendant devised a sophisticated scheme to defraud Medicare whereby patients' symptoms and/or conditions were falsified in the medical records in order to make it appear the indications for the ultrasound testing were appropriate.   Patient test results were routinely falsified simply to justify repeat testing.   False diagnoses were assigned to the Medicare billing to reflect the falsified test results.  This was all done to give the appearance that the services being billed met Medicare guidelines and regulations and to ensure payment for what would otherwise be considered unnecessary testing.

19.     On the first day of employment with Defendant, the office manager, named Teresa, gave Relator what was referred to as a "cheat sheet" of Medicare approved diagnosis codes to be used for billing the ultrasound tests.  Relator was told to use only the approved diagnosis codes on the sheet otherwise Medicare would not pay for the ultrasound studies.  In previous employment and training, Relator was never asked to assign diagnoses codes and felt uncomfortable being required to attribute conditions that she knew were not based on patients' test findings.  In an attempt to gain an understanding of what she was being told, Relator asked Defendant why she was being instructed to assign a patient who had a normal abdominal aortic ultrasound, an incorrect diagnosis of an abdominal aortic aneurysm.  Defendant told her, *"You are billing the diagnosis that you are looking for in the study."*

20.     According to the CMS Claims Processing Manual, Chapter 23, Fee Schedule and Administrative Coding Requirements, Section 10, states, *providers are to code the patient's symptoms when a diagnosis is not definitive and never code suspected diagnoses.*  Proper coding is necessary on Medicare claims as codes are generally used in determining coverage and payment

amounts. (Emphasis added). An example would be a patient that had a normal abdominal aortic ultrasound for symptoms of unexplained abdominal pain. The abdominal pain would be billed as the diagnosis even though the physician may have ordered the study suspecting an aortic aneurysm. The abdominal aortic aneurysm would not be coded as the patient's diagnosis unless the ultrasound study conclusively showed the condition.

21.    Defendant knew by billing this specific condition, "aortic aneurysm of unspecified site" and selecting the ICD-9 code 441.9, that Medicare would allow the abdominal aortic ultrasound to be repeated annually. Defendant would use CPT code 93978 (defined as a duplex scan of aorta, inferior vena cava, iliac vasculature, or bypass grafts) and the above diagnosis. If Defendant billed a symptom, such as unexplained abdominal pain instead of the aneurysm diagnosis, then future studies would be denied for Medicare payment or questioned by CMS since a definitive diagnosis would be required for any further repeat tests. It became clear to Relator that Defendant was intentionally using the false diagnosis to open the door to unnecessary repeat testing such that the government would be none the wiser.

22.    Suzanne Summers, the person in Defendant's office in charge of billing, told Relator that she was trying to work with Defendant on his "blanket billing" because Ms. Summers was starting to see a large number of payment denials for ultrasound tests from private insurance companies but not yet from Medicare. Ms. Summers told Relator that Defendant was receiving the denials because he used the same diagnoses for patients and was ordering ultrasound testing too often. Relator was also told by Ms. Summers that Defendant directed her to, *"go back and change the diagnosis codes to see if that would work,"* for any tests that were denied payment by Medicare. It was common practice by Defendant to change diagnoses and procedure codes in an attempt to receive payment or prevail in appeals on claim denials.

23.     Defendant routinely falsified patients' diagnoses in their medical records that were not supported by the ultrasound findings.  For example, patients were routinely given diagnoses of "chronic renal failure," when renal and renal artery ultrasound studies were normal; "carotid artery plaque," when carotid ultrasound studies were normal; "atherosclerosis of extremities with intermittent claudication," when lower extremity arterial duplex scans were normal; and "atrial fibrillation and heart valve disorders" which were not supported by the patient's medical records.  These false diagnoses were central to the scheme perpetrated by Defendant to increase billing.

24.     By falsifying patients' conditions, Defendants ensured that the medical record documentation would meet Medicare requirements and withstand CMS inquiries into the appropriateness of the ordered tests.  Relator noticed that patients were repeatedly scheduled for various types of diagnostic ultrasound and non-invasive arterial/vascular testing.  Prior to performing the ultrasound examination, Relator would follow-up with patients and review their medical records to verify if there had been any change in their treatment or condition.  The medical record documentation would often conflict with what the patient told Relator and with the actual results of the testing.  For example, Relator would ask a patient, "Are you having chest pain?" or "Do you have hypertension?" and the patients often responded that they did not have these complaints.  While performing ultrasound tests, Relator was repeatedly told by patients that they did not have the symptoms Defendant had documented in their medical record and they did not understand why they needed repeat testing.  An additional symptom patients frequently denied suffering from included abdominal and calf pain (intermittent claudication) related to walking.

25.   The following patient examples are provided to illustrate the Defendant's falsification of medical records:[2]

**Medicare patient number 2375**

26.   Defendant directed Ms. Summers to resubmit a bill to reflect a pancreatic ultrasound was performed instead of a renal arterial ultrasound (CPT 76770) if Medicare denied the claim for this patient for service that occurred on August 22, 2014.  The billing instructions were written as follows,

*"change to pancreas ultrasound 76705 if ins [sic] doesn't cover."*

**Medicare patient number 1305**

27.   Relator performed a Lower Extremity Arterial Ultrasound Doppler examination on this patient on October 10, 2014.  One of the indications listed for this test by Defendant was "intermittent claudication."  Prior to performing the test, Relator's routine assessment of the patient found there were no complaints of lower leg pain or cramping as had been noted by Defendant in the medical record.  If there had been pain as Defendant documented, then there would be indication for the test to be performed with the expectation that blockages would be found.  However, in addition to the absence of complaints about pain, Relator observed no blockages on the ultrasound images and documented the test findings as normal.

28.   Defendant's actions show a lack of regard for his patients while having devised an elaborate scheme to ensure ultrasound testing could be repeated unnecessarily on patients to increase billing to Medicare and Medicaid.  Defendant falsely interpreted normal test results as abnormal in order to meet Medicare requirements for repeat studies.  Relator frequently conducted ultrasound testing that showed no abnormalities and documented as such, but

---

[2] Relator has supplied Defendant's internal account number for most patients.

Defendant would subsequently interpret findings as having *"stenosis and follow-up recommended."* Defendant routinely provided false test interpretations when anatomical sites could not be visualized as the result of insignificant findings, patient position and/or documented use of "gray scale" imaging when this measurement capability did not exist on the equipment at Defendant's office.

**Medicare patient number 1286**

29. This patient was a 92-year-old female. On August 26, 2014, a renal and renal artery ultrasound was attempted on this patient. Due to this patient's inability to lie on her side for visualization of the kidney, Relator was unable to obtain images of the renal arteries and noted that in the tech sheet. Defendant subsequently, without any ability to visualize the renal arteries, falsely interpreted stenosis (narrowing) of the arteries being present at 30% for both the left and right sides of the kidney and hand-wrote 30% on the tech sheet as if the technician had made the notation. Defendant billed Medicare for both ultrasounds.

**Medicare patient 001[3]**

30. This patient was a 54-year-old male on Medicare Disability for whom a Carotid Duplex Ultrasound was performed on August 26, 2014. Relator performed the test on this patient and found it to be an "essentially normal study." Defendant subsequently provided the following interpretation:

> *"Gray scale analysis suggests stenosis of 47% and 46% for right and left internal carotid arteries. Antegrade vertebral artery flow is present. The right ICA/CCA ratio is 1:13 (normal < 2). Clinical correlation is suggested and further followup [sic] as warranted".*

---

[3] No internal account number was available, so control number 001 is used

31.     In previous offices where she worked, Relator had access to office equipment that captured gray scale measurements.  Relator explained that ultrasound equipment with gray scale capabilities measures the outside of the vessel and the plaque inside and gives a percentage of stenosis or narrowing.  Gray scale shows as different shades of gray causing the image to appear brighter and allows the image to be more easily viewed compared to the obsolete black and white display.  Unfortunately, the Gray Scale measuring package software was not available on the Defendants' outdated office equipment used for imaging the carotid arteries.  Without this information, Defendant could not estimate the percent of occlusion in the vessel thereby making the test of little to no diagnostic value.

32.     Defendant routinely falsified these findings stating the percent of vessel narrowing using Gray Scale.  Defendant knew medical record documentation would need to support the use of Gray Scale measurements in order to receive Medicare payment.  The Medicare requirement for the use of Gray Scale measurements as part of the carotid examination is noted in the Local Coverage Determination (LCD) L29235 Non-invasive Extracranial Arterial Studies.[4]

33.     Defendant routinely falsified medical records in order to perform a number of ultrasound examinations on Medicare and Medicaid patients to include abdominal aortic ultrasounds, carotid ultrasounds and renal and renal artery ultrasounds.

34.     An abdominal aortic aneurysm (AAA) is an abnormal outward ballooning of the large blood vessel (aorta) that supplies blood to the abdomen, pelvis, and legs usually due to the

---

[4]Doppler ultrasonography is used to evaluate hemodynamic parameters, specifically the velocity of blood flow and the pattern or characteristics of flow. A key component of vascular diagnostic ultrasound is the B-mode, or brightness-mode image. This real time imaging technique provides a two-dimensional *gray-scale image* of the soft tissues and vessels based on the acoustic properties of the tissues."

build-up of plaque. Aneurysms usually do not cause any symptoms until they become very large or rupture and can be difficult to feel through the layers of the abdominal wall.[5]

35.     Abdominal Aortic Duplex Scans/ultrasounds can be used to help screen for abnormal vessels but are imprecise in measuring aneurysm size which is an important component of prognosis and in the determination of aneurysm growth.[6]   If the aneurysm becomes too large, when the vessel size reaches 5.0 cm (2 in.) or greater, then surgical repair is typically done.[7]  The normal range of the aortic vessel size is 1.4 cm – 3 cm. with an average size of 2.0 cm.

36.     Medicare guidelines as stated in the Local Coverage Determination L29159 for Aorta Duplex Scanning (CPT code 93978) provide coverage for duplex scanning of aorta, inferior vena cava, iliac vasculature, or bypass grafts when performed for one or more of the following indications:

- To confirm a suspicion of an abdominal or iliac aneurysm raised by a physical examination or noted as an incidental finding on another radiological examination.
- The physical examination usually reveals a palpable, pulsatile and nontender abdominal mass.

   The progression of an abdominal aortic aneurysm is monitored and it is expected that monitoring occur approximately every six (6) months.[8]
   The ICD-9 diagnostic code is 441.9 (Aortic aneurysm, unspecified site, without mention of rupture).

---

[5] EMedicineHealth. Abdominal Aortic Aneurysm.
http://www.emedicinehealth.com/aortic_aneurysm/page3_em.htm.
[6] Society of Vascular Surgery Practice Guidelines. "The Care of Patients with an Abdominal Aortic Aneurysm: The Society of Vascular Surgery Practice Guidelines; " Chaikof, et al. Journal of Vascular Surgery, October Supplement 2009.
[7] American Heart Association. Cardiology Patient Page; Circulation. Patrick T. O'Gara, M.D.
http://circ.ahajournals.org/content/107/6/e43.full.
[8] Society of Vascular Surgery Practice Guidelines state surveillance imaging at six-month intervals is recommended for patients with an AAA diameter between 4.5 and 5.4 cm.

37.     During her course of employment, Relator witnessed Defendant ordering annual AAA ultrasound exams on patients, and sometimes more frequently, despite a history of normal test results. Defendant would then falsely bill Medicare with the payable diagnosis code, "aortic aneurysm, unspecified site, without mention of rupture" (ICD-9 code 441.9).  When patients presented to Relator for the AAA ultrasound test, she would check the patient's chart and routinely notice Defendant would falsely document in the medical record the same medical indications for all aortic ultrasounds as: "abdominal bruit" and "abdominal pulsatile mass." These symptoms were routinely used on patients when Defendant ordered abdominal aortic ultrasounds despite not being evident to Relator during the test.

38.     An abdominal "bruit" is the swooshing sound that is made when blood is trying to be pushed past an obstruction such as plaque.  This noise can be heard through a stethoscope while examining the abdomen.  An aneurysm can also pulsate as the heart is pumping blood through the compromised vessel wall. Sometimes this can be felt as a pulsating mass, although it can be difficult to identify due to the thick stomach layers.

39.     A physical exam that would include feeling and listening to the abdomen would reveal a pulsatile mass and bruit at which time an ultrasound could confirm a possible aneurysm. If the patient had an abdominal bruit and/or pulsatile mass it would be observed in the ultrasound image as evidence of vibration in the tissue surrounding the arterial narrowing.  Relator confirmed through her ultrasound imaging that these symptoms did not exist for many of these patients yet Defendant falsely documented these indications in order to be able to repetitively order the AAA ultrasounds.

40.     Defendant would receive the normal images sent by Relator through the computer and would interpret them by falsely documenting an aneurysm as being present, but that it was

"*not significant,*" when no aneurysm actually existed.  Defendant falsely diagnosed these non-existent aneurysms so studies could be repeated the following year according to Medicare guidelines.[9]  In addition, Defendant  would routinely document that "*clinical correlation is suggested and further followup [sic] as warranted*" when no further treatment was provided except for repeating unnecessary studies.[10]   The following are examples of ultrasound tests where Defendant routinely used and then falsified information, such as conditions and/or symptoms, as indications for the testing and falsified test findings:

**Medicare patient number 1242**

41.     This patient was a 69-year-old female who had an Aortic Abdominal Duplex Scan (ultrasound) performed on January 9, 2014.  Relator's tech sheet showed normal aortic vessel size with the distal and proximal aorta measuring between 1.60- 2.37 cm. (normal range 1.4 cm – 3.0 cm.).  Relator's interpretation summary documented, "*This was essentially a normal study.*" Defendant's final report concluded:

> "*Based on dimension recorded, the greatest diameter of the abdominal aorta occurs proximally at 2.4 x 2.4 cm. (rounding is standard practice). There is no evidence of a significant aneurysm.  Clinical correlation is suggested and further followup [sic] as warranted*"

42.     Defendant, in an attempt to suggest an aneurysm was present but not "significant," intentionally documented misleading statements in order to justify the false indications of "abdominal bruit" and "pulsatile mass" but also to justify billing the test and the false diagnosis of an aortic aneurysm (unspecified) which would allow continued monitoring of ultrasound tests according to Medicare coverage guidelines.  In addition to falsely documenting

---

[9] Medicare Policy & Guidelines- LCD for AAA monitoring
[10] According to the Society of Vascular Surgery Practice Guidelines, if any aneurysm is detected, the patient should have a CT scan to exclude rupture and be referred to a vascular surgeon.  A CT scan is the preferred initial test in patients with significant risk factors or a *pulsatile mass.*

that an aneurysm was present, Defendant never documented any measurements indicating the size of the alleged aneurysm that would make it necessary for future follow-up or clinical correlation.

**Medicare patient number 1276**

43.    This patient was a 76-year-old female who had an Aortic Abdominal Duplex Scan (ultrasound) performed on August 28, 2014.  Defendant's final report concluded,

> "*Based on dimension recorded, the greatest diameter of the abdominal aorta occurs in the proximal and distal segments at 2.25 x 2.25 cm. (normal range 1.4 cm – 3.0 cm.).  No evidence of a significant aneurysm.  Clinical correlation is suggested and further followup [sic] as warranted."*

Once again Defendant, in an attempt to falsely imply an aneurysm was present but not "significant," intentionally documented false statements in order to justify ordering the initial ultrasound test, and then billed the false diagnosis in an effort to justify the continued monitoring with ultrasound studies while falsely meeting Medicare guidelines.   In addition to falsely documenting an aneurysm was present, there was no specific documentation by Defendant identifying the size of the alleged aneurysm that would make it necessary for future follow-up or clinical correlation.   According to the Medicare billing, this patient had two unnecessary Abdominal Aortic Ultrasound tests (CPT 93978) performed that allegedly showed there was an *"no evidence of a significant aneurism"* on June 14, 2012 and June 18, 2013.   However, and somewhat medically impossible, as aneurism do not generally disappear with surgery, the next study performed on August 28, 2014 was normal.

**Medicare patient number 1305**

44.    This patient was a 45-year-old male on Medicare disability.   On October 10, 2014, Defendant ordered an Aortic Abdominal Duplex Scan (ultrasound) using the same indications of "Abdominal bruit and abdominal pulsatile mass."  According to Defendant report,

the abdominal aortic findings were normal measuring 2.64 x 2.64 cm (normal range 1.4 cm – 3.0 cm) with no evidence of an aneurysm.    Relator knew upon conducting the ultrasound examination the patient did not have an abdominal bruit and/or an abdominal pulsatile mass as had been falsely documented by Defendant, which was supported by the normal study findings.

**Carotid Artery Ultrasounds (CPT code 93880)**

45.    According to the Society of Radiologists, carotid duplex scan/ultrasound is by far the most common imaging examination performed worldwide to aid in the diagnosis of carotid disease.[11] This vascular imaging study is typically the only test performed before surgical intervention so it is of utmost importance that information provided by the doctor's examination is reproducible and reliable according to the Society of Radiologists.[12]

46.    Carotid Artery Ultrasounds are used to determine if there is any abnormal build-up of plaque (atherosclerosis) within the major extracranial and intracranial arteries, specifically the carotid and vertebral arteries, leading to the brain. This excessive build-up of plaque can lead to a Trans-Ischemic Attack (TIA) and/or stroke. The internal carotid artery (ICA) is used as the primary parameter in determining stroke risk.

47.    Defendant routinely ordered annual carotid ultrasound exams on patients, and sometimes more frequently, despite normal results. When patients presented to Relator for the carotid ultrasound test, she would check the patients' chart and routinely noticed Defendant would document in the medical record the same canned symptoms for all patients such as "hypertension, hypercholesterolemia, heart murmur and carotid bruit." After repeatedly performing these carotid ultrasound studies and not finding any evidence of carotid bruits in the

---

[11] Carotid Artery Stenosis: Gray Scale and Doppler Ultrasound Diagnosis- Society of Radiologists in Ultrasound Consensus Conference. *Radiology 2003*: Vol. 229, No.2; pgs. 340-346. Edward Grant, M.D., et al. http://scottalexander.me/wp-content/uploads/2012/03/US-carotid-stenosis-PSV-values-grant-radiol-2003.pdf.
[12] *Ibid*

test, Relator realized Defendant was falsely documenting the carotid bruit in order to meet Medicare requirements for the test.

48.     A carotid bruit is a swooshing sound that is made when blood is trying to be pushed past an obstruction such as plaque.  This noise can be heard through a stethoscope while examining the neck but is unlikely to be heard if the stenosis occludes less than 40% of the diameter of the artery.  If the patient had a carotid bruit, as the Defendant suggested, then it would also be observed during the ultrasound testing as a vibration in the tissue surrounding the arterial narrowing.  Relator confirmed through her ultrasound imaging that these symptoms did not exist for many patients and Defendant falsely documented these indications in order to be able to order the carotid ultrasound and subsequently bill Medicare.

49.     Defendant routinely falsely interpreted carotid artery reports documenting the use of Gray Scale when the office ultrasound machine did not have this measurement capacity.  Despite not having this capability, Defendant would routinely interpret the percent of plaque occlusions that would meet Medicare guidelines for continued monitoring with ongoing ultrasound testing.  According to the Society of Radiologists, any occlusion measurement less than 50% is virtually undetectable by ultrasound.[13]  Defendant routinely interpreted occlusions less than 50% in order to meet Medicare guidelines for retesting.

50.     Defendant would receive the normal images sent by Relator through the computer and would interpret them by falsely documenting that stenosis was present when none actually existed.  Medicare was then billed for a false diagnosis taken from the Medicare Payable Diagnoses list for carotid duplex ultrasounds.  Relator was required by Defendant to use either

---

[13] Carotid Artery Stenosis: Gray Scale and Doppler Ultrasound Diagnosis- Society of Radiologists in Ultrasound Consensus Conference. *Radiology 2003*: Vol. 229, No.2; pgs. 340-346. Edward Grant, M.D., et al.
http://scottalexander.me/wp-content/uploads/2012/03/US-carotid-stenosis-PSV-values-grant-radiol-2003.pdf.

occlusion or stenosis of carotid artery without mention of cerebral infarction (stroke) or rupture (ICD-9 code 433.10) or other symptoms involving cardiovascular system (ICD-9 code 785.9). This was done so studies could be repeated the following year according to Medicare guidelines. In addition, Defendant would routinely document, *"clinical correlation is suggested and further followup [sic] as warranted"* when no further treatment was provided except for repeating unnecessary studies. The following are examples of carotid ultrasound tests where Defendant routinely used and then falsified information, such as conditions and/or symptoms, as indications for the testing and falsified test findings:

**Medicare patient number 2946**

51.    This patient was a 36-year-old male on Medicare disability with a history of psychiatric disorders.  This patient was accompanied by his mother for an appointment on September 30, 2014, who told Relator their insurance company referred them to Defendant. Relator performed the carotid ultrasound study on this patient and found it to be an "essentially normal study."  The tech sheet shows the ICA/CCA ratio to be 0.57 on the right and 0.51 on the left (normal < 2).  Defendant documented on the report the canned indications for the test as "hypertension, hypercholesterolemia, heart murmur and carotid bruit."  Relator never detected a carotid bruit during the exam and was unable to detect any blockages.  The ultrasound report was interpreted by Defendant claiming to use gray scale as follows:

> *"Gray scale analysis suggests stenosis of 25% and 30% for right and left internal carotid arteries.  Antegrade vertebral artery flow is present.  Clinical correlation is suggested and further follow-up is warranted."*

Defendant intentionally falsified the percent of occlusion using gray scale measurements that were not even available on the equipment used and falsified the indications for the test in order

to make it meet the Medicare criteria. This patient's carotid duplex scan/ultrasound exam was normal.

**Medicare patient 001**

52.     This patient was a 54-year-old male on Medicare Disability who had a Carotid Duplex Ultrasound performed on August 24, 2014. Relator performed the test on this patient and found it to be an "essentially normal study." Defendant documented on the report the indication for the test as *"hypertension, hypercholesterolemia, heart murmur and carotid bruit."* Relator never detected a carotid bruit during the exam and knows this combination of conditions was used regularly as indications despite being nonexistent. The ultrasound report was interpreted by Defendant who claimed to use gray scale as follows:

> *"Gray scale analysis suggests stenosis of 47% and 46% for right and left internal carotid arteries. Antegrade vertebral artery flow is present. The right ICA/CCA ratio is 1:13 (normal < 2). Clinical correlation is suggested and further followup [sic] as warranted".*

53.     Defendant intentionally falsified the percent of occlusion using gray scale measurements that were not even available on the equipment and falsified the indications for the test in order to make it meet the Medicare criteria. This patient's carotid duplex scan/ultrasound exam was normal.

**Renal Ultrasounds (CPT 76770) and Renal Artery Duplex Scans (CPT 93975)**

54.     A renal ultrasound is used to determine the size, shape and location of the kidneys. It may be helpful in detecting cysts, tumors, obstructions, abscesses, fluid collection or infection in the kidneys. For billing purposes, a renal ultrasound test is included in the retroperitoneum due to the close proximity of other organs and structures. This area includes the pancreas, kidneys, bladder, abdominal aorta and other surrounding structures. Defendant routinely billed retroperitoneal ultrasound testing represented by CPT code 76770.

55.    The renal artery ultrasound or duplex scan is a separate test from the renal ultrasound and focuses on the blood flow to surrounding organs, such as the kidneys.  These arteries may narrow or become blocked and this may result in kidney failure or uncontrolled hypertension if not corrected.    This test measures the speed of blood flow through the arteries and determines the degree of narrowing of the artery or renal artery stenosis (RAS).

56.    Defendant routinely ordered annual, and sometimes more frequently, renal ultrasounds and renal artery studies on patients despite normal test results.  When patients presented to Relator for the renal ultrasounds and renal artery tests, she would check the patients' chart and would notice that Defendant would ascribe patients the same canned conditions for the tests that were performed, *"vascular disorder of the kidneys, atherosclerosis of the renal arteries and unspecified essential hypertension."*  Relator knew from her training and previous work experience the indications for renal artery studies would include treatment for hypertension that were resistant to medications and included abnormal urine tests.   While reviewing patients' medical records, she noticed this was not representative of the patients' conditions even though they had been scheduled for both a renal ultrasound and renal arterial study.

**Medicare patient number 1286**

57.    This patient was a 92-year-old female who had a routine renal ultrasound and renal artery scan performed on August 26, 2014.  Prior renal ultrasounds (CPT 76770) and renal arterial studies (CPT 93975) were performed on May 3, 2012 and June 14, 2013.  Defendant's order was for the renal ultrasound and renal artery scan to be done together at the same scheduled time for the same canned indications, *"vascular disorder of the kidneys, atherosclerosis of the renal arteries and unspecified essential hypertension."*   Relator documented on the tech sheet that the test was a suboptimal study obtaining limited views due to

the patient's inability to hold her breath and being forced to lie on her back due to immobility. Relator was unable to visualize both renal arteries and documented that on the tech sheet. Relator described this patient as frail and slightly demented.   This patient's daughter accompanied her on the visit and told Relator she did not understand why Defendant kept ordering annual tests on a 92-year-old woman who had difficulty turning on her side for the tests and, as a result, the images could not be obtained and the study would not show the renal arteries.

58.    Despite not being to see the renal arteries on the scan, Defendant falsely interpreted both the right and left renal arteries as having 30% obstruction and hand-wrote the 30% on the tech sheet as if the technician had written it.  Defendant's report read as follows:

> "Based on peak flow velocity, the greatest degree of stenosis of right and left renal arteries measure 1-49% with gray scale analysis of 30 and 30% for right and left renal arteries without evidence of critical stenosis."

59.    The renal study had been duplicated from the prior year, June 14, 2013, despite the August 26, 2014 renal ultrasound showing kidney normal measurements (8.22 cm). Routinely ordering testing with no medical indication would be considered a screening exam according to Medicare guidelines and non-covered since the renal ultrasound and the arterial studies did not change the clinical course of this elderly patient.

60.    Defendant falsely interpreted the findings of the renal arterial exam (CPT 93975) and the conditions under which the exam occurred.  The renal ultrasound (CPT 76770-59) was falsely billed with a modifier -59 which Defendant knew was required in order to receive Medicare payment for both tests.   This modifier allows claims to bypass payment edits because it indicates that the first test was abnormal and lead to an additional follow-up test to be performed at a separate time.   Relator knew this was never the situation and that all renal

ultrasounds were ordered with renal arterial studies and performed at the same time regardless of the exam findings. Defendant knowingly falsified interpreted test result findings and falsified the billing.

**Medicare patient number 2422**

61.     This patient was a 67-year-old female who received a routine renal ultrasound and renal arterial study on August 26, 2014. Prior renal ultrasound and renal artery studies were done on October 28, 2013. Defendant's order was for both the renal ultrasound and renal artery scan to be done together at the same scheduled time for the same canned indications, *"vascular disorder of the kidneys, atherosclerosis of the renal arteries and unspecified essential hypertension."* Relator visualized a normal exam and documented such on the tech sheet.

> *"This was essentially a normal study. No evidence of RAS (renal arterial stenosis) bilaterally."*

Defendant falsely interpreted the findings using gray scale analysis describing the arteries as follows:

> *"Based on peak flow velocity, the greatest degrees of stenosis of right and left renal arteries measure 1-49% with gray scale analysis of 48 and 45% for right and left renal arteries without evidence of critical stenosis. Based on dimensions recorded, the right renal parenchyma measures 10.5 x 4.81 x 4.21 cm (normal 8.4 cm – 13.1 cm +/- 2) and on the left side 9.50 x 4.57 x 5.54 cm. No evidence of a critical cyst, mass or calculi is present. Clinical correlation is suggested and further followup [sic] in the future indicated as warranted."*

62.     Relator knows through her training and extensive job experience the renal artery ultrasound images cannot be visualized to the level of detail needed to allow Defendant to assign a specific percent of obstruction (48% and 45%) due to the small size of the vessels. The renal artery diameter is approximately 5-6 mm or the width of a pencil eraser. Defendant routinely interpreted occlusions less than 50%. According to the Society of Radiologists, any occlusion measurement less than 50% is virtually undetectable by ultrasound testing. Diminished images

are even more pronounced in smaller vessels such as the renal artery. This is in contrast to other more sophisticated testing techniques such as the Magnetic Resonance Angiogram (MRA).

63.     Defendant would receive the normal images sent by Relator through the computer and would interpret them by falsely documenting the percent of artery obstruction and suggesting that stenosis was not "critical" when none actually existed. Defendant randomly assigned borderline arterial obstructions so studies would appear abnormal and could be repeated according to Medicare guidelines. In addition, Defendant would routinely document that *"clinical correlation is suggested and further followup [sic] as warranted"* when no further treatment was provided except for repeating unnecessary studies.

64.     Defendant falsely interpreted the findings of the renal arterial exam (93975) and the conditions under which the exam occurred. The renal ultrasound (CPT 76770-59) was falsely billed with a modifier -59 which Defendant knew was required in order to receive Medicare payment for both tests. This modifier allows claims to bypass payment edits because it indicates that the first test was abnormal and lead to an additional follow-up test to be performed at a separate time. Relator knew this was never the situation and that all renal ultrasounds were ordered with renal arterial studies and performed at the same time regardless of the exam findings. Defendant knowingly falsified interpreted test result findings and falsified the billing.

**Medicare patient number 2175**

65.     This patient was a 55-year-old female on Medicare disability who received a routine renal ultrasound on August 26, 2014. Defendant's order was for both the renal ultrasound and renal artery scan to be done together at the same scheduled time for the same canned indications, *"vascular disorder of the kidneys, atherosclerosis of the renal arteries and*

*unspecified essential hypertension."* Relator was able to visualize a normal exam and documented such on the technician's sheet as follows:

> *"This was essentially a normal study. No evidence of RAS (renal artery stenosis) bilaterally."*

Defendant falsely interpreted the findings using gray scale analysis describing the arteries as follows:

> *"Based on peak flow velocity, the greatest degrees of stenosis of right and left renal arteries measure 50-59% and 1-49% with gray scale analysis of 53 and 45% for right and left renal arteries without evidence of critical stenosis. Based on dimensions recorded, the right renal (kidney) parenchyma measures 10.0 x 3.31 x 4.06 cm and on the left 9.02 x 4.61 x 3.78 cm. (normal 8.4 cm – 13.1 cm +/- 2). No evidence of critical cyst, mass or calculi is present. Clinical correlation is suggested and further followup [sic] in the future indicated as warranted."*

66.   Relator knows through her training and extensive job experience the renal artery ultrasound images cannot be visualized to the level of detail needed to allow Defendant to assign a specific percent of obstruction (53% and 45%) due to the small size of the vessel.  Relator's tech sheet showed the Ao SV measurement for the proximal renal artery to be 83.2 cm/s (normal 50–100 cm/s), which is a key indicator for renal artery stenosis.

67.   Defendant would receive the normal images sent by Relator through the computer and would falsely interpret them by documenting the percent of artery obstruction and suggesting that stenosis was not "critical" when none actually existed.  Defendant randomly assigned borderline arterial obstructions so studies would appear abnormal and could be repeated according to Medicare guidelines.  In addition, Defendant  would routinely document that *"clinical correlation is suggested and further followup [sic] as warranted"* when no further treatment was provided except for repeating unnecessary studies.

68.   Defendant falsely interpreted the findings of the renal arterial exam (CPT 93975) and the conditions under which the exam occurred.  The renal ultrasound (CPT 76770-59) was

falsely billed with a modifier -59 which Defendant knew was required in order to receive Medicare payment for both tests.

**Medicare patient number 1862**

69.     This patient was a 91-year-old female who received a routine renal ultrasound and renal arterial study on August 26, 2014. Defendant's order was for both the renal ultrasound and renal artery scan to be done together at the same scheduled time for the same "canned" indications, "vascular disorder of the kidneys, atherosclerosis of the renal arteries and unspecified essential hypertension." Relator was able to visualize a normal exam and documented supportive findings as follows:

> RAR 1.12 (normal < 3.5),
> RA SV 115 cm/s right renal artery (normal < 150 cm/s)
> RA SV 75.8 cm/s left renal artery (normal < 150 cm/s)

Defendant falsely interpreted the findings using gray scale analysis describing the arteries as follows:

> *"Based on peak flow velocity, the greatest degrees of stenosis of right and left renal arteries measures 1-49% with gray scale analysis of 49 and 35% for right and left renal arteries without evidence of critical stenosis. Based on dimension recorded, the greatest diameter of the right renal parenchyma measures 8.05 x 4.73 x 3.01 cm and on the left 8.22 x 4.51 x 3.50 cm. (normal 8.4 cm – 13.1 cm +/- 2). No evidence of a critical cyst, mass or calculi is present. Clinical correlation is suggested and further followup [sic] in the future indicated as warranted."*

70.     Defendant would receive the normal images sent by Relator through the computer and falsely interpreted them by documenting the percent of artery obstruction while suggesting that the stenosis was not "critical" when none actually existed. Relator knows through her training and extensive job experience the renal artery ultrasound images cannot be visualized to the level of detail needed to allow Defendant to assign a specific percent of obstruction (49% and

35%) due to the small size of the vessel. Defendant randomly assigned borderline arterial obstructions so studies would appear abnormal and could be repeated according to Medicare guidelines. In addition, Defendant would routinely document that *"clinical correlation is suggested and further followup [sic] as warranted"* when no further treatment was provided except for repeating unnecessary studies.

71.     Defendant falsely interpreted the findings of the renal arterial exam (CPT 93975) and the conditions under which the exam occurred. The renal ultrasound (CPT 76770-59) was falsely billed with a modifier -59 which Defendant knew was required in order to receive Medicare payment for both tests. This modifier allows claims to bypass payment edits because it indicates that the first test was abnormal and lead to an additional follow-up test to be performed at a separate time. Relator knew this was never the situation and that all renal ultrasounds were ordered with renal arterial studies and performed at the same time regardless of the exam findings. Defendant knowingly falsified interpreted test result findings and falsified the billing.

72.     Defendant knew by routinely using billing modifier -59 with CPT code 76770 when billing CPT code 93975, Medicare claim edits would be bypassed allowing payment for the tests. Defendant also knew by billing these codes together using the modifier that it did not meet the indications and requirements set forth by Medicare's NCCI coding requirements. Relator was instructed by Defendant to perform the renal ultrasound and the renal artery studies together regardless of normal test findings. Patients were routinely scheduled to have these tests performed on the same day and at the same scheduled time. Relator was only allowed 30 minutes per patient to complete both a renal ultrasound and renal artery duplex scan by Defendant. Relator knows from her training and experience that standard testing time for a renal

ultrasound is 30 minutes while a renal artery study takes approximately 45 minutes which is a significantly greater time commitment than what Defendant allowed.

73.     After completing a patient's ultrasound test, Relator was required by Defendant to assign one of the provided diagnosis codes from the approved list or cheat sheet (Exhibit 5). This list of ultrasound tests with matching Medicare payable diagnosis codes was routinely used to bill Medicare for diagnoses that Relator knew the patient did not have as a result of the test she had just performed.  Patients were commonly given false diagnoses of unspecified chronic kidney disease (ICD-9 code 585.9), atherosclerosis of renal artery (ICD-9 code 440.1) and vascular disorders of kidney.

**Lower Extremity Arterial Ultrasound Doppler Study (CPT code 93925)**

74.     A duplex Doppler ultrasound uses traditional ultrasound methods to produce an image of a blood vessel.  A computer converts the Doppler sounds into a graph that provides information about the speed and direction of blood flow and any obstructions.[14]  The purpose of a lower extremity arterial evaluation is to detect the presence, severity and location of atherosclerosis (narrowing of the arteries caused by plaque) in the legs.  Part of this study includes taking blood pressure measurements in the legs and arms called Ankle Brachial Pressure Index (ABI). An ABI measurement is a good indicator of blocked arteries and the need for further follow-up if there is a lower blood pressure in the leg compared to the arm.

75.     Medicare will consider a lower arterial ultrasound Doppler study for the following conditions:

- A decreased Ankle/Brachial Indices (ABI) result from a previous exam.

---

[14] *The Lowdown on Extremity Studies*; Radiology Today; Vol. 10, No. 12. Lauren Jandroep, OTR, CPC-EMS, CPC-H, RCC; Pg. 8. June 15, 2009.
http://www.radiologytoday.net/archive/rt061509p8.shtml#sthash.t3wwjH1d.dpuf

- Claudication (pain in leg caused by walking) of less than one block or of such severity that it interferes significantly with the patient's occupation of lifestyle.

76.    Non-invasive studies of the arterial system are to be utilized when invasive correction is contemplated but not to follow non-invasive medical treatment regimens such as evaluating pharmacologic intervention or unchanged symptomatology.   When an ABI is abnormal (< 0.9) it must be accompanied by another appropriate indication before proceeding to more sophisticated or complete studies, except in patients with severely elevated ankle pressure.[15]

77.    In Relator's past experience, ABI's were always done at the time the lower extremity arterial studies were done.   When she started working for Defendant, Relator was told not to do them because the medical assistants routinely performed ABI's on all office patients.   It was common knowledge among the staff that Defendant still ordered lower extremity arterial studies regardless of normal ABI results.   This does not meet Medicare's policy and guidelines as stated above and resulted in the Defendant submitting invoices and being paid for medically unnecessary testing.

78.    ABI ranges are considered normal from 1.0 to 1.4.   ABI Readings in the range of 0.8 to 0.9 can mean there is some arterial disease and may be probable signs of intermittent claudication.[16]   A value below 0.9 is considered diagnostic of peripheral arterial disease (PAD).

79.    After completing a patient's ultrasound test, Relator was required by Defendant to assign one of the provided diagnosis codes from the "approved list".   This list of ultrasound tests with their matching Medicare payable diagnosis codes was routinely used to bill Medicare for diagnoses Relator knew the patient did not have as a result of the tests she had performed.   It was

---

[15] Ankle Brachial Index. Stanford School of Medicine. www.stanfordmedicine25.standford.edu/the25/ankle.html.
[16] Ibid.

common that patients be given false diagnoses of atherosclerosis of extremities with intermittent claudication (ICD-9 code 440.21) and peripheral vascular disease, unspecified (ICD-9 code 443.9) that were not evident in the test results. The "cheat sheet" given to Relator also instructed her on what codes *not* to use, such as atherosclerosis of renal artery (ICD-9 440.1), since Medicare would not pay for this diagnosis with this service.

80.     Relator is aware Defendant routinely ordered the lower extremity arterial studies on patients annually, and sometimes more frequently, despite normal results. When patients presented to Relator for the test, she would check the patient's chart and notice Defendant would document in the medical record the same canned symptoms for all patients as "hypertension, hypercholesterolemia, and bi-femoral bruits and intermittent claudication." After repetitively performing these lower arterial studies and not finding any evidence of bi-femoral "bruits" in the test and patients denying having symptoms of intermittent claudication (pain in lower leg with walking), Relator realized Defendant was falsely documenting the patient conditions of bi-femoral bruits and intermittent claudication in order to meet Medicare requirements for the test.

81.     Relator provides the following patient examples whereby patients had lower extremity arterial studies done at the same time abdominal aortic ultrasounds were performed. Defendant falsely documented that both Ms. Leibold and Mr. Ecock had symptoms of bi-femoral bruits with intermittent claudication and abdominal bruits with abdominal pulsatile masses. Relator expected to see severe atherosclerotic disease as a result of Defendant's significant physical exam findings, but instead saw normal ultrasound studies for both abdominal and lower extremities. Relator knew that Defendant falsified patient conditions in order to justify completing the tests.

**Medicare patient number 1242**

82.     This patient was a 69-year-old female who received a lower extremity arterial ultrasound Doppler study on January 9, 2014, (same day as the abdominal aortic ultrasound) for hypertension, hypercholesterolemia, and bilateral bi-femoral bruits with intermittent claudication.  Relator was able to visualize a normal exam and documented supportive findings on the tech sheet.  The Doppler waveform was documented as "multiphasic flow" which was normal resting blood flow with no occlusions.[17]  This was further supported by Defendant's documentation of a normal ABI of 1.0 for both lower extremities.  Defendant falsely interpreted the findings as follows:

> *"Based on peak flow velocity, the greatest degrees of stenosis of the right lower extremity occur in the right common femoral artery at 50 – 59% as it does in the mid superficial femoral artery as well.  The proximal and distal superficial femoral arteries and the proximal tibial artery have stenosis of 48%.  On the left side, the left common femoral artery has stenosis of 50 – 59%.  The proximal superficial and mid superficial femoral arteries have stenosis of 48%. Multiphasic waveforms are seen bilaterally and ankle brachial indices of 1.0 bilaterally.  Clinical correlation is suggested and further follow in the future indicated."*

83.     Defendant received the normal images sent by Relator through the computer and falsely interpreted them by documenting various amounts of artery stenosis being present when none actually existed.  Relator knows through her training and extensive job experience the lower extremity arterial ultrasound images were normal and did not visualize the specific percent of obstruction Defendant noted in the report.  Defendant randomly assigned borderline arterial obstructions so studies would appear abnormal and could be repeated according to Medicare guidelines.  In addition, Defendant would routinely document that *"clinical correlation is*

---

[17] "Spectral Doppler Signature Waveforms in Ultrasonography; A Review of Normal and Abnormal Waveforms. Megan Wood, et al. Ultrasound Quarterly; Vol. 2; No. 2. June 2010.
http://www.slredultrasound.com/Filesandpictures/Guidelines10.pdf

*suggested and further followup [sic] as warranted"* when no further treatment was provided except for repeating unnecessary studies.

**Medicare patient number 1305**

84.     This patient was a 45-year-old male on Medicare Disability who received a lower extremity arterial ultrasound Doppler study on October 10, 2014 (same day as the abdominal aortic ultrasound).   Relator was able to visualize a normal exam, no bi-femoral bruits and documented the following on the tech sheet: *"This was essentially a normal study."*   Defendant falsely interpreted the findings as follows:

> *"Based on peak flow velocity, the greatest degree of stenosis of the right and left lower extremities occur at no greater than 46% bilaterally. Clinical correlation is suggested and further followup [sic] in the future is indicated as warranted."*

85.     Defendant received the normal images sent by Relator through the computer and falsely interpreted them by documenting 46% of artery stenosis being present when none actually existed.  Relator knows through her training and extensive job experience the lower extremity arterial ultrasound images were normal and did not visualize the specific percent of obstruction Defendant noted in the report.   Defendant randomly assigned borderline arterial obstructions so studies would appear abnormal and could be repeated according to Medicare guidelines.  Relator also knows from the normal test results it is very unlikely that this patient would not be symptomatic with intermittent claudication as Defendant falsely documented in the medical record.

### B.  Medically Unnecessary Testing

86.     Relator has first-hand knowledge, and it was well known among the office staff, that Defendant coerced or misled patients into getting tests they did not want or feel were necessary.  There were frequent "no-shows" for ultrasound studies and patients would refuse or

walk out of testing. On many occasions Defendant told patients that their insurance required the tests and they would lose their insurance if the tests were not done.

87.     When Medicare patient number 1911 questioned Defendant about why she needed to have an ultrasound study done, Relator overheard Defendant tell the patient that if she did not get the test done, *"Medicare might drop her."*

88.     Relator had a conversation with an 83-year-old Medicare patient (002), who told her he had complained to Defendant about having to come to the office on separate days for all of the testing because he had $25 copay for each visit. Defendant told this patient that his insurance company, "Freedom," required the tests and also required them to be done on different days. This patient told Relator he called his insurance company and they assured him that it was Defendant who required the tests and not them.

89.     On September 30, 2014, Medicare patient 003 was in the office for a repeat renal ultrasound test. This patient had undergone a renal ultrasound test 3 months prior on June 17, 2014 and told Relator she was going to start keeping track of the frequency of tests because "he was all about the money."

90.     During Relator's employment with Defendant, patients were subjected to a barrage of multiple diagnostic ultrasounds without regard to current condition or future treatment plans. Defendant routinely ordered ultrasound tests on patients that were medically unnecessary and did not change the course of treatment or offer any therapeutic value to the patient's wellbeing. In many instances, patients were forced to undergo extremely uncomfortable positions for extended periods of time while these tests were being performed.

**Medicare patient number 2834**

91.     This patient was an 87-year-old patient who had an abdominal aortic ultrasound performed by Relator on May 27, 2014.  This patient was known to have advanced pancreatic cancer with metastases to the bone and liver prior to Defendant ordering the aortic ultrasound. The test was normal however any potential findings of an aortic aneurysm at this stage in his disease process would be inoperable making this ultrasound test medically unnecessary. Defendant had also ordered a carotid ultrasound but this patient was in so much pain while lying on the exam table that Relator refused to complete the testing knowing it was unnecessary.

**Medicare patient number 1286**

92.     This patient was a 92-year-old female on Medicare who had a routine renal ultrasound and renal artery scan performed by Relator on August 26, 2014.  Her daughter accompanied her since she had mild dementia, was uncomfortable on the exam table, and was unable to lie on her side for the test.  This patient's daughter was upset that Defendant  kept putting her mother through all of these tests when nothing would be done due to her advanced age and told Relator this would be the last time she would allow any more testing on her mother. Despite having an incomplete test performed due to this patient's inability to cooperate, Defendant falsely interpreted the results.

93.     Relator knew because of patient 2834's terminal illness and patient 1286's age, they were not candidates for future treatment related to these ultrasound studies.  Defendant knew these tests were medically unnecessary and therefore did not meet Medicare's coverage policy.  Defendant instructed the office staff to book ultrasound tests on a strict time schedule that did not allow adequate time for the studies to be performed.  On more than one occasion, Relator expressed concern to Defendant about the limited time requirements and the effects of the test result quality.  Defendant responded to Relator by telling her, *"that is the way I want it."*

94.     Relator had never encountered this high volume of daily tests in her career as a certified ultrasound technician and relying on her extensive prior experience, she knew approximately 18 patients per day was the maximum number that could be done safely and effectively by one technician.   Defendant demanded an abbreviated testing time, which would allow for an average of 12 to 14 patients each day with each patient receiving two ultrasounds. If a patient did not show up for their scheduled ultrasound, Relator was instructed by Tara Hoggard, Senior Medical Assistant, to pull patients out of the doctor's waiting room to fill the vacant space.   In response, Relator told Ms. Hoggard that she could not just randomly pull patients without knowing if they needed the test and Ms. Hoggard replied,

> *"We just do them all on everyone once a year if not sooner.   We can get away with a lot on ultrasounds with the diagnosis code."*

95.     Relator was told by Ms. Hoggard that only certain tests could be performed together and Defendant would order them in a predetermined sequence regardless of need. Relator was told by Ms. Hoggard not to vary the sequence even if the patient requested since Medicare would not pay for certain test combinations on the same day of service.[18]   Relator had never encountered a situation where ultrasounds tests were routinely ordered and performed in a predetermined sequence without regard to medical need.   This is evidenced on Appointment Schedules.

The following studies were routinely ordered and performed together:

- Abdominal Aortic Ultrasound (CPT code 93978) was ordered and scheduled with non-invasive studies of the lower extremities (CPT code 93925 and 93926).

- Carotid ultrasound (93880) was ordered and scheduled with transthoracic echocardiography (CPT code 93306).

---

[18] Medicare National and Local Coverage Determinations list tests that can be performed together and others that are considered inclusive and cannot be combined.

- Renal ultrasound (CPT code 76770) was ordered and scheduled with renal artery ultrasound (CPT code 93975).

96.     Defendant methodically ordered and performed unnecessary testing on patients on an annual basis.   As described above, two studies would be performed on the same day and coded in such a way as to get past any Medicare edits that were designed to catch improper billing.  Defendant easily manipulated Medicare rules and procedures to ensure that they would continue pay for the ultrasound examinations.  The below charts provide the specific ultrasound performed and the dates of service.  Two ultrasound examinations were being performed on each patient for multiple years in a row.  The medical record for the patients below did not support the need of these ultrasound examinations on an annual basis.  Defendant manufactured and falsified diagnosis in order to bill Medicare for ultrasound examinations that were not medically necessary.

**Medicare patient number 1555**

97.     This patient was an 80-year-old female who received a carotid ultrasound test (CPT 93880) and an echocardiogram (CPT 93306) twice in 20012 and once in 2013.   This patient also had an abdominal aortic ultrasound (CPT 93978) and bilateral lower extremity arterial studies (CPT 93925) done at least annually and on the same day as the carotid ultrasound and the echocardiogram.   Renal (CPT 76770) and renal artery (CPT 93975) ultrasounds were also done at least annually.

**Medicare patient number 1276**

98.     This patient was a 76-year-old female on Medicare. The carotid ultrasound tests (CPT 93880) were done on the same day as the echocardiograms (CPT 93306) showing the repetitive pattern of routine tests.  This duo of tests was performed for three consecutive years. This patient had annual abdominal aortic ultrasounds (CPT 93978) performed despite normal

findings as evidenced by the August 28, 2014 test results. Bilateral lower extremity arterial studies (CPT 93925) were done at least annually with the abdominal aortic ultrasounds and occurred once with a carotid ultrasound and echocardiogram.   Renal (CPT 76770) and renal artery (CPT 93975) ultrasounds were also done at least annually.

**Medicare patient number 1557**

99.    This patient was a 75-year-old male on Medicare.  The carotid ultrasound tests (CPT 93880) were done on the same day as the echocardiograms (CPT 93306) showing the repetitive pattern of routine tests.  This duo of tests was performed for three consecutive years. This patient had annual abdominal aortic ultrasounds (CPT 93978) performed with bilateral lower extremity arterial studies (CPT 93925).   The lower extremity arterial studies were done annually despite normal finding as evidenced by the August 27, 2014 test results. Renal (CPT 76770) and renal artery (CPT 93975) ultrasounds were also done at least annually.

**Medicare patient number 1862**

100.    This patient was a 91-year-old female on Medicare. The carotid ultrasound tests (CPT 93880) were done on the same day as the echocardiograms (CPT 93306) showing the repetitive pattern of routine tests.  This duo of tests was performed annually.  This patient also had an abdominal aortic ultrasound (CPT 93978) and bilateral lower extremity arterial studies (CPT 93925) done at least annually and on the same day as the carotid ultrasound and the echocardiogram.   Renal (CPT 76770) and renal artery (CPT 93975) ultrasounds were also performed annually despite normal results as evidenced by the August 28, 2014 study results.

**Medicare patient number 1899**

101.    This patient was a 79-year-old male on Medicare. The carotid ultrasound tests (CPT 93880) were done on the same day as the echocardiograms (CPT 93306) showing the

repetitive pattern of routine tests. This duo of tests was performed annually for at least 3 years. This patient had annual abdominal aortic ultrasounds (CPT 93978) performed with bilateral lower extremity arterial studies (CPT 93925). Renal (CPT 76770) and renal artery (CPT 93975) ultrasounds were also performed annually.

**Medicare patient number 130**

102.    This patient was a 45-year-old male on Medicare disability. Based on the provided billing, the carotid ultrasound tests CPT (93880) have been done at least annually since 2012 showing a repetitive pattern of routine tests. The carotid ultrasound was performed once on the same day as an echocardiogram (CPT 93306).    This patient also had abdominal aortic ultrasounds (93978) and bilateral lower extremity arterial studies (CPT 93925) done at least annually on the same day despite normal results for both studies as evidenced by the October 10, 2014 test results. Renal (CPT 76770) and renal artery (CPT 93975) ultrasounds were also performed together.

**Medicare patient number 2375**

103.    This patient was a 69-year-old female on Medicare. The carotid ultrasound tests (93880) have been performed annually since 2013 showing a repetitive pattern of routine tests. In this instance, the carotid ultrasound was performed once on the same day as an echocardiogram (CPT 93306). This patient also had abdominal aortic ultrasounds (CPT 93978) and bilateral lower extremity arterial studies (CPT 93925) performed annually on the same day. Renal (CPT 76770) and renal artery (CPT 93975) ultrasounds were also performed together once within 6 weeks and annually according to the billing records.

**Medicare patient number 1286**

104.    This patient was a 92-year-old female on Medicare. Based on the available billing the carotid ultrasound test (93880) was done once on the same day as the echocardiogram (CPT 93306) showing the repetitive pattern of routine tests. This patient also had an abdominal aortic ultrasound (CPT 93978) and bilateral lower extremity arterial studies (CPT 93925) performed on the same day as the carotid ultrasound and the echocardiogram.   Renal (CPT 76770) and renal artery (CPT 93975) ultrasounds were also performed annually despite having a normal renal ultrasound test as evidenced by the August 26, 2014 study.

**Medicare patient number 2267**

105.    This patient was a 72-year-old female on Medicare. The carotid ultrasound tests (CPT 93880) were done on the same day as the echocardiograms (CPT 93306) showing the repetitive pattern of routine tests.  This duo of tests was performed annually for at least 2 years based on the available billing.  This patient had regularly scheduled abdominal aortic ultrasounds (CPT 93978) performed with bilateral lower extremity arterial studies (CPT 93925). Renal (CPT 76770) and renal artery (CPT 93975) ultrasounds were also performed despite having normal test results as evidenced by the August 27, 2014 study.

**Medicare patient number 2422**

106.    This patient was a 67-year-old female on Medicare. The carotid ultrasound tests (CPT 93880) were done on the same day as the echocardiograms (CPT 93306) showing the repetitive pattern of routine tests.  This duo of tests was performed annually for at least 2 years based on the available billing.  This patient had annually scheduled abdominal aortic ultrasounds (93978) performed with bilateral lower extremity arterial studies (CPT 93925). Renal (CPT 76770) and renal artery (CPT 93975) ultrasounds were also performed despite having normal test results as evidenced by the August 26, 2014 study.

**Damages**

107.   Beyond the direct damages paid by the government as a result of the Defendants' fraudulent scheme, the government suffered an additional element of consequential damages in the form of the false diagnoses liberally ascribed by Defendants.   The false diagnosis almost always results in a more severe diagnosis for a patient than they actually have.   This diagnostic information or data is in turn used to determine the risk profile of various patient populations. The Defendants scheme has directly caused faulty datasets to be created which results in increased expense to the government.

**I.     The False Claims Act**

108.   The FCAs, as amended, provide in pertinent part that:

[A]ny person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; ... or (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990...plus 3 times the amount of damages which the Government sustains because of the act of that person.
31 U.S.C. § 3729(a)(1) and §68.082 Fla. Stat.

109.   The terms "knowing" and "knowingly" in the FCA provision above "mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A).  No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).  See also §68.082 Fla. Stat.

## II.     Cost Reporting and Claims Processing Procedures Under the Medicare Program

110.    In 1965, Congress enacted the Health Insurance for the Aged and Disabled Act, 42 U.S.C. § 1395 et seq., known as the Medicare Program, as part of Title XVIII of the Social Security Act, to pay for the costs of certain health care services. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. See 42 U.S.C. §§ 426, 426-1.

111.    Reimbursement for Medicare claims is made by the United States through the Centers for Medicare and Medicaid Services ("CMS"), which is an agency of the Department of Health and Human Services ("HHS") and is directly responsible for the administration of the Medicare Program.

112.    CMS contracts with private companies, referred to as "fiscal intermediaries," to administer and pay claims from the Medicare Trust Fund. 42 U.S.C. § 1395(u). In this capacity, the fiscal intermediaries act on behalf of CMS. 42 C.F.R. § 413.64. Under their contracts with CMS, fiscal intermediaries review, approve, and pay Medicare bills, called "claims," received from medical providers. Those claims are paid with federal funds.

113.    There are two primary components to the Medicare Program, Part A and Part B. Medicare Part A authorizes payment for institutional care, including hospitals, skilled nursing facilities, and home health care. 42 U.S.C. § 1395c-1395i-5. Medicare Part B is a federally subsidized, voluntary insurance program that covers a percentage of the fee schedule for physician services as well as a variety of medical and other services to treat medical conditions or prevent them.   42 U.S.C. §§ 1395j-1395w-5.   The allegations herein involve Part B for services billed by the Defendant to Medicare.

114.    In order to get paid from Medicare, providers, like Defendant herein, complete and submit a claim for payment on a designated Health Insurance Claim Form, which, during the

relevant time period, was or has been designated CMS 1500. This form contains patient-specific information including the diagnosis and types of services that are assigned or provided to the Medicare patient. The Medicare Program relies upon the accuracy and truthfulness of the CMS 1500 to determine whether and what amounts the provider is owed.

115.   To this end, the Health Insurance Claim Form, CMS 1500, contains the following certification by the physician or supplier submitting a claim to Medicare:

> I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

That certification is then followed by the following "Notice:"

> Anyone who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

## A. Conditions of Participation and Conditions of Payment

116.   To participate in the Medicare Program, a health care provider must also file a provider agreement with the Secretary of HHS. 42 U.S.C. § 1395cc. The provider agreement requires compliance with certain requirements that the Secretary deems necessary for participating in the Medicare Program and for receiving reimbursement from Medicare.

## B. Medical Necessity and Appropriateness Requirements

117.   One such important requirement for participating in the Medicare Program is that for all claims submitted to Medicare, claims may be submitted only when medical goods and services are (1) shown to be medically necessary, and (2) are supported by necessary and accurate information. 42 U.S.C. § 1395y(a)(1)(A),(B); 42 C.F.R., Part 483, Subpart B; 42 C.F.R. § 489.20.

118.   Various claims forms, including but not limited to the Hospital Cost Report and the Health Insurance Claim Form, require that the provider certify that the medical care or services rendered were medically "required," medically indicated and necessary and that the provider is in compliance with all applicable Medicare laws and regulations.   42 U.S.C. § 1395n(a)(2); 42 U.S.C. § 1320c-5(a); 42 C.F.R §§ 411.400, 411.406.   Providers must also certify that the information submitted is correct and supported by documentation and treatment records. Id. See also, 42 U.S.C. § 1320c-5(a); 42 C.F.R. § 424.24.

119.   The practice of billing goods or services to Medicare and other federal health care programs that are not medically necessary is known as "overutilization."

## C. Obligation to Refund Overpayments

120.   As another condition to participation in the Medicare Program, providers are affirmatively required to disclose to their fiscal intermediaries any inaccuracies of which they become aware in their claims for Medicare reimbursement (including in their cost reports).   42 C.F.R. §§ 401.601(d)(iii), 411.353(d); 42 C.F.R. Part 405, Subpart C. See also 42 C.F.R. §§ 489.40, 489.31.   In fact, under 42 U.S.C. § 1320a-7b(a)(3), providers have a clear, statutorily-created duty to disclose any known overpayments or billing errors to the Medicare carrier, and the failure to do so is a felony.   Providers' contracts with CMS carriers or fiscal intermediaries also require providers to refund overpayments. 42 U.S.C. § 1395u; 42 C.F.R. § 489.20(g).

121.   Accordingly, if CMS pays a claim for medical goods or services that were not medically necessary, a refund is due and a debt is created in favor of CMS.   42 U.S.C. § 1395u(l)(3).   In such cases, the overpayment is subject to recoupment.   42 U.S.C. § 1395gg. CMS is entitled to collect interest on overpayments. 42 U.S.C. § 1395l(j).

III.   **Other Federally-Funded Health Care Programs**

122.   Although false claims to Medicare are the primary FCA violations at issue in this case, the patients who were subjected to the medically unnecessary procedures that are the subject of this action were beneficiaries of one of three federally-funded health care benefit programs – Medicare, Medicaid, or Tricare/CHAMPUS. Accordingly, those other two programs are briefly discussed as well.

123.   The Medicaid Program, as enacted under Title XIX of the Social Security Act of 1965, 42 U.S.C. § 1396, et seq., is a system of medical assistance for indigent individuals. CMS administers Medicaid on the federal level while the Florida Agency for Healthcare Administration serves as the Florida State administrator or counterpart. Reimbursement of hospital costs or charges is governed by Part A of Medicare, through the hospital cost report system, and reimbursement of physician charges is governed by Part B of Medicare. As with the Medicare Program, hospitals and physicians may, through the submission of cost reports and health insurance claim forms, recover costs and charges arising out of the provision of appropriate and necessary care to Medicaid beneficiaries.

<u>**Claims For Relief**</u>

**First Cause Of Action**
**Presentation of False Claims pursuant to 31 U.S.C. § 3729(a)(1)(A)**

124.   Relator repeats and incorporates herein by reference the allegations contained in paragraphs 1 to 123 above as if fully set forth herein.

125.   By virtue of the acts alleged herein Defendant has knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A) that is, Defendant knowingly made or presented, or caused to be made or

presented, to the United States, claims for payment for tests, treatments, and services for patients which were medically unnecessary, were not provided, were not provided as billed, lacked proper documentation, or which were otherwise inappropriate.

126.   The government, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendant, has paid and continues to pay the claims that would not be paid but for Defendant's false and fraudulent claims for reimbursement.

127.   As a result of the foregoing, the United States suffered actual damages in an amount to be determined at trial; and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,500 and not more than $11,000 per false claim.

## SECOND CAUSE OF ACTION
### Making or Using False Record or Statement to Cause Claim to be Paid
### Pursuant to 31 U.S.C. § 3729(a)(1)(B)

128.   Relator repeats and incorporates herein by reference the allegations contained in paragraphs 1 to 123 above as if more fully set forth herein.

129.   By virtue of the acts alleged herein Defendant knowingly made, used, or caused to be made or used, false records or statements – i.e., the false certifications, false medical records and other false or fraudulent representations made or caused to be made by Defendant – material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

130.   As a result of the foregoing, the United States suffered actual damages in an amount to be determined at trial; and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,500 and not more than $11,000 per false claim.

## THIRD CAUSE OF ACTION
### Making or Using False Record Statement to Avoid an Obligation to Refund

**Pursuant to 31 U.S.C. § 3729(a)(1)(G)**

131.   Relator repeats and incorporates herein by reference the allegations contained in paragraphs 1 to 123 above as if more fully set forth herein.

132.   By virtue of the acts alleged herein Defendant has knowingly made, used, or caused to be made or used, false records or statements – i.e., the false certifications, medical records, and other false or fraudulent representations made or caused to be made by Defendant – material to an obligation to pay or transmit money to the government to knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the government.

133.   The government relied upon the false records or statements in remitting payments to Defendant and in not seeking reimbursement from Defendant.

**FOURTH CAUSE OF ACTION**
**Florida False Claims Act**
**Florida Statutes Section 68.081 et. seq.**

134.   Relator repeats and incorporates by reference the allegations contained in paragraphs 1 to 123 above as if fully set forth herein.

135.   By virtue of the acts alleged herein Defendant made or presented false or fraudulent claims and performed one of more acts to effect payment of false or fraudulent claims.

136.   Section 68.082 provides liability for any person who:

(a)   Knowingly presents or causes to be presented to an officer or employee of an agency a false or fraudulent claim for payment or approval;

(b)   Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency;

(c)   Conspires to submit a false or fraudulent claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed or paid.

137.    Defendant knowingly violated section 68.082 and knowingly caused numerous false claims to be made, used, and presented to the state of Florida.

138.    The state of Florida, by and through the Florida Medicaid program and other state health care programs, and unaware of the fraudulent and illegal practices of Defendant, paid the false and/or fraudulent claims.

139.    Compliance with applicable Medicare, Medicaid, and the other various other federal and state laws cited herein was an implied and also an express condition of payment of claims submitted to the state of Florida in connection with the fraudulent and illegal practices of Defendants.

140.    The false statements, representations, and records made by the Defendants had the potential to and did in fact influence the state of Florida's decisions on payment.

141.    The ultimate submission by the Defendant of false and/or fraudulent claims to the state Medicaid program was a foreseeable factor in the state of Florida's loss, and a consequence of the scheme. As a result of Defendant's violations of section 68.082 of the Florida Statutes, the state of Florida has been damaged.

142.    This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of Florida in the operation of its Medicaid program.

## DEMAND FOR RELIEF

WHEREFORE, Relators, on behalf of the United States and the state of Florida, hereby demand judgment against Defendant as follows:

**As to the Federal Claims:**

a. Pursuant to 31 U.S.C. § 3729(a), Defendant pay an amount equal to three times the amount of damages the United States Government has sustained because of Defendant's

conduct, plus a civil penalty of not less than $5,500 and not more than $11,000 or such other penalty as the law may permit and/or require for each violation of 31 U.S.C. § 3729, *et seq*;

b. Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3729(d) of the False Claims Act and/or any other applicable provision of law;

c. Relators be awarded all costs and expenses of this action, including attorneys' fees as provided by 31 U.S.C. § 3729(d) and any other applicable provision of the law; and

d. Relators be awarded such other and further relief as the Court may deem to be just and proper.

**As to the State Claims:**

a. Pursuant to the Florida False Claims Act, §68.081 et. seq., Defendant pay an amount equal to three times the amount of damages the state of Florida has sustained because of Defendant's conduct, plus a civil penalty of not less than $5,500 and not more than $11,000 or such other penalty as the law may permit and/or require for each violation of the Florida False Claims Act;

b. Relator be awarded the maximum amount allowed pursuant the Florida False Claims Act and/or any other applicable provision of law;

c. Relator be awarded all costs and expenses of this action, including attorneys' fees as provided by the Florida False Claims Act and any other applicable provision of the law; and

d. Relator be awarded such other and further relief as the Court may deem to be just and proper.

## TRIAL BY JURY

Relators hereby demand a trial by jury as to all issues.

Dated this 21st day of April, 2015.

Respectfully submitted,

John A. Yanchunis (FL Bar No. 324681)
jyanchunis@forthepeople.com
James D. Young (FL Bar No. 567507)
jyoung@forthepeople.com

MORGAN & MORGAN
COMPLEX LITIGATION GROUP
201 N. Franklin St., 7th Floor
Tampa, Florida 33602
(813) 318-5169 (Telephone)
(813) 222-4793 (Facsimile)